WYC:SCF

# M-10-1357

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

FELIX LANTING,

          Defendant.

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

THE PREMISES KNOWN AND DESCRIBED
AS 133 HUNTER AVENUE,
STATEN ISLAND, NEW YORK 10306

- - - - - - - - - - - - - - - -X

SEALED COMPLAINT AND
AFFIDAVIT IN SUPPORT OF
SEARCH AND ARREST
WARRANTS

(T. 21, U.S.C., §§
846, 841(a)(1),
841(b)(1)(C), and 812;
T. 18, U.S.C., § 2)

EASTERN DISTRICT OF NEW YORK, SS:

       MICHAEL S. TRIGLIA, being duly sworn, deposes and

states as follows:

## INTRODUCTION

       1.   I am an "investigative or law enforcement officer

of the United States" within the meaning of Section 2510(7) of

Title 18, United States Code, that is, an officer of the United

States who is empowered by law to conduct investigations of and

to make arrests for offenses enumerated in Section 2516, Title

18, United States Code.  I have been employed by the Federal

Bureau of Investigation ("FBI") for approximately two and a half

years.  During the course of my career, I have conducted

investigations of health care fraud, and have conducted or participated in wire and physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, debriefings of informants, and reviews of taped conversations and drug records.  Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, and the methods of payment for such drugs.

2.    I submit this Affidavit in support of the Government's application for: A) a search warrant to enter and search THE PREMISES KNOWN AND DESCRIBED AS 133 HUNTER AVENUE, STATEN ISLAND, NEW YORK 10306 (the "SUBJECT PREMISES") and to seize the items set forth below and in ATTACHMENT A, all of which constitute evidence, fruits, and/or instrumentalities of violations of Title 21, United States Code, Section 846; and B) a warrant to arrest the defendant FELIX LANTING for violations of Title 21, United States Code, Section 846.

3.    Upon information and belief, in or about and between April 2010 and November 2010, both dates being approximate and inclusive, within the Eastern District of New York, the defendant FELIX LANTING, together with others, did knowingly and intentionally conspire to distribute and dispense and possess with intent to distribute and dispense a controlled substance, which offense involved Oxycodone, commonly known as

-2-

"OxyContin," a Schedule II controlled substance, contrary to
Title 21, United States Code, Section 841(a)(1).

(Title 21, United States Code, Sections 846 and
841(b)(1)(C); Title 18, United States Code, Sections 3551 et
seq.)

4.   The facts contained in this Affidavit are based in
part upon personal knowledge, and in part upon information
learned from other sources, such as other Special Agents of the
FBI and other law enforcement personnel, confidential sources,
eyewitnesses, surveillance, audio and video recordings, physical
evidence and other documents recovered and gathered during the
course of the investigation, as well as on my experience and
background as a Special Agent of the FBI.  Where conversations,
statements and the actions of others are related herein, they are
related in substance and in part, unless otherwise indicated.
Because this Affidavit is submitted for the limited purpose of
establishing probable cause to search the SUBJECT PREMISES and to
arrest defendant FELIX LANTING, I have not set forth every fact
that I have learned over the course of this investigation.

5.   Based on my training and experience, including the
investigation of diversion of legitimately-manufactured
pharmaceuticals to unauthorized individuals, I am familiar with
various types of legitimate controlled substances in Schedule II
of 21 U.S.C. § 812 that are often distributed illegally.  As

-3-

relevant to this case, Oxycodone, commonly known as "OxyContin," is a semi-synthetic opiod analgesic that is similar to codeine and is included as a Schedule II controlled substance. Oxycodone is prescribed to relieve moderate to severe pain, but it can result in addiction similar to morphine. There is an illegal market for Oxycodone as a substitute for, or adjunct to, other illegal narcotics.

<u>DESCRIPTION OF THE PREMISES</u>

6. During the course of this investigation, I have observed the SUBJECT PREMISES, including its surrounding area. I have also spoken with other agents who have entered the SUBJECT PREMISES in an undercover capacity. The SUBJECT PREMISES is a two story, single family, detached house. The first floor of the SUBJECT PREMISES is utilized as a makeshift medical office, and consists of, among other rooms, a vestibule, a living room and a dining room. LANTING's "office" is contained in the residence's dining room. The second floor of the SUBJECT PREMISES is a private residence, utilized by LANTING and his wife. The outside of the SUBJECT PREMISES consists of siding, and is colored white. Photographs depicting the SUBJECT PREMISES are attached hereto as Exhibits A and B, respectively.

PROBABLE CAUSE TO SEARCH THE SUBJECT PREMISES AND ARREST LANTING

7.    Since in or about April 2010, LANTING has been
under investigation for suspected narcotics trafficking.
Specifically, the government's investigation to date indicates
that LANTING is distributing and dispensing, and conspiring to
distribute and dispense narcotics, including Oxycodone, outside
the scope of professional medical practice and not for a
legitimate medical purpose from the SUBJECT PREMISES.

8.    The SUBJECT PREMISES is located in a residential
neighborhood in the New Dorp section of Staten Island.  Since at
least May 2010, the SUBJECT PREMISES has been at the center of a
number of complaints that have been placed to various law
enforcement agencies, including the FBI, by individuals who live
in the surrounding area.  According to some of these complaining
residents, since at least April 2010, the SUBJECT PREMISES has
been visited by an increasing number of individuals looking to
meet with LANTING in order to purchase a prescription for pain
medication, such as Oxycodone.  Neighbors have observed these
individuals gain access to the SUBJECT PREMISES, and exit
thereafter, often carrying an unidentified piece of paper.
Neighbors have also observed empty prescription pill bottles for
Oxycodone littering the area around the SUBJECT PREMISES.

9.    Information provided by neighbors of the SUBJECT
PREMISES, and a review of the text of certain complaints publicly

filed with the New York City Police Department, indicate that the SUBJECT PREMISES has been vandalized by one or more individuals who are apparently unhappy with the quantity and quality of the visitors to LANTING's operation at the SUBJECT PREMISES.

10.  I have reviewed certain records obtained during the course of this investigation from the Bureau of Narcotics Enforcement.  According to those records, since April 2010 LANTING has written and distributed approximately 3,029 prescriptions for Oxycodone to various patients – an average of 15 Oxycodone prescriptions per day, seven days per week.  Four hundred and ninety of LANTING's customers who received Oxycodone prescriptions during this time period were under the age of thirty.  Furthermore, 149 individuals have received at least seven separate prescriptions for narcotics from LANTING between April 2010 and October 2010.

11.  During the course of this investigation, I have learned certain information about LANTING's operation at the SUBJECT PREMISES from speaking with a confidential source (hereinafter "CS-1"):

a.  On or about April 7, 2010, CS-1, and another individual "Conspirator 1,"[1] traveled to the SUBJECT PREMISES in order to purchase a prescription from LANTING for Oxycodone.  CS-

---

[1]  I am aware of the identities of all the individuals referenced by aliases in this Affidavit.

-6-

1 has described Conspirator 1 as a "runner" for LANTING's
operation, and in such capacity appears to be recruiting
"patients" to present to LANTING so that those "patients" can
purchase prescriptions for Oxycodone from LANTING.  Before the
visit, Conspirator 1 provided CS-1 with a fraudulent MRI report
to show to LANTING in order to receive the prescription.  Once
inside the SUBJECT PREMISES, CS-1 had a face-to-face meeting with
LANTING.  At the conclusion of that meeting LANTING provided CS-1
with a prescription for 30 milligrams of Oxycodone consisting of
180 tablets.  LANTING did not perform a medical examination of
CS-1, nor did he request any medical information from CS-1.[2]  At
the conclusion of the visit, Conspirator 1 paid LANTING an
undisclosed amount of cash for the prescription provided to CS-1.
Based on information obtained from CS-1 as well as other law
enforcement officers, it is believed that Conspirator 1
frequently re-sells the pills that he obtains from LANTING for a
profit.

        b.   On or about April 26, 2010, CS-1 and
Conspirator 1 traveled to the SUBJECT PREMISES in order to
purchase a prescription for Oxycodone from LANTING.  During this
second visit, CS-1 had a face-to-face meeting with LANTING, while

---

        [2]    Because LANTING performed no medical evaluation on CS-1
before selling him a prescription for Oxycodone, CS-1 did not
have to provide LANTING with the fraudulent MRI that had
originally been given to CS-1 by Conspirator 1.

Conspirator 1 remained in a car outside the SUBJECT PREMISES. CS-1's meeting with LANTING lasted approximately one minute. During that meeting LANTING did not conduct a physical examination of CS-1, nor did he ask CS-1 any medical-related questions. Nevertheless, LANTING provided CS-1 with another prescription for 30 milligrams of Oxycodone consisting of 180 tablets. Upon receiving the prescription, CS-1 proceeded outside, received an unknown amount of cash from Conspirator 1, returned to the SUBJECT PREMISES, and handed the cash directly to LANTING.

12. On or about Wednesday, May 26, 2010, CS-1 introduced an undercover agent of the FBI (hereinafter "UC-1") to LANTING, at the SUBJECT PREMISES. Both UC-1 and CS-1 were wearing audio and video recording devices during this visit to the SUBJECT PREMISES. At that time, CS-1 and UC-1 each attempted to meet with LANTING for the purpose of purchasing a prescription for Oxycodone, however, they were advised by LANTING that he was only seeing patients on Mondays and Thursdays. CS-1 proceeded to call Conspirator 1 and persuaded Conspirator 1 to contact LANTING to see if an exception to this schedule could be made. LANTING refused to see UC-1 and CS-1, however.

13. Subsequently, on or about June 3, 2010, UC-1 and another undercover FBI agent (hereinafter "UC-2") traveled to the SUBJECT PREMISES in order to purchase a prescription for

-8-

Oxycodone from LANTING.  UC-1 wore a video and audio recording device during the visit.  Upon arriving, UC-1 noticed the front door of the SUBJECT PREMISES was affixed with a sign that read "Office Closed Vacation."  While waiting outside the SUBJECT PREMISES, UC-1 was given LANTING's phone number by an unidentified male who was also attempting to see LANTING at that time.  UC-1 proceeded to call LANTING, and during the ensuing telephone conversation LANTING informed UC-1 that his office was closed indefinitely because the authorities were going to shut him down and that LANTING feared for his life.  LANTING then recanted and agreed to meet with UC-1 at 5:30 p.m. later that evening because LANTING would have protection at that time.  At approximately 5:30 p.m. UC-1 and UC-2 were permitted access into the SUBJECT PREMISES by an unknown male.  Upon entry, UC-1 noticed multiple individuals sitting in the office's waiting area.  UC-1 and UC-2 were eventually escorted to see LANTING, however, they were not provided with a prescription for Oxycodone at that time, because LANTING told them they would need a "MRI" in order to receive pain medication from him.

14.  On or about July 29, 2010, CS-1, while wearing an audio and video recording device, met with LANTING at the SUBJECT PREMISES for the purpose of obtaining a prescription for Oxycodone.  LANTING provided CS-1 with a prescription for 30 milligrams of Oxycodone consisting of 180 tablets.  LANTING did

-9-

not conduct any physical examination of CS-1 during the visit,
nor did he ask CS-1 any questions related to CS-1's medical
condition.  CS-1 paid LANTING $200 cash for the prescription and
made another appointment to see LANTING on August 26, 2010.

15.  On or about September 9, 2010, UC-1 and CS-1, each
wearing audio and video recording devices, traveled to the
SUBJECT PREMISES in order to meet with LANTING and purchase a
prescription for Oxycodone.  On this particular visit, UC-1 and
CS-1 were met at the door to the SUBJECT PREMISES by two
individuals, who told UC-1 and CS-1 that they could not see
LANTING at that time, and that their appointments would have to
be changed to September 15, 2010.

16.  During the course of this investigation, the FBI
has learned certain additional information about LANTING's
operation at the SUBJECT PREMISES from speaking with another
confidential source (hereinafter "CS-2").  CS-2 has indicated
that in or about September 2010, LANTING "hired" approximately
three individuals, described as "goons" or "bouncers," to control
the door at the SUBJECT PREMISES and supervise the clientele that
was frequenting LANTING's office in order to receive
prescriptions for narcotics.[3]  According to CS-2, in the days and

---

[3]      During the course of this investigation, law
enforcement has been able to glean the identifies of three
individuals serving as security at the SUBJECT PREMISES:
"Conspirator 2," "Conspirator 3" and "Conspirator 4."
Conspirator 2 has previously suffered a conviction for Criminal

weeks prior to the bouncers' arrival, there had been an increased
amount of disruption in the neighborhood, and the SUBJECT
PREMISES had been broken into by at least one individual looking
for prescription drug pills.[4]  According to CS-2, the bouncers
serving at LANTING's office have also recruited their own
"patients" to purchase prescriptions from LANTING.  In many of
these instances, when a "patient" comes to the SUBJECT PREMISES,
a bouncer will provide the "patient" with $200 cash and then
escort the patient to see LANTING.  The "patient" then gives the
$200 cash to LANTING who writes a prescription, usually for 180
or 240 Oxycodone tablets.  According to CS-2, this entire process
takes approximately one minute, after which one or more bouncers
escort the patient out of the office and give the patient an
additional $300 cash and the name of a pharmacy where he or she

---

Possession of a Weapon in the Fourth Degree in violation of Penal
Law section 265.01, while Conspirator 3 has previously been
convicted of Attempted Criminal Possession of a Controlled
Substance with Intent to Sell, a felony.  Conspirator 4 has
previously sustained numerous convictions for offenses including
Reckless Driving, Disorderly Conduct (twice), and Attempted
Resisting Arrest.

[4]      The information provided by CS-2 concerning the need
for "bouncers" at the SUBJECT PREMISES is consistent with
additional information provided by another confidential source
(hereinafter "CS-3").  According to CS-3, LANTING stopped seeing
"patients" for a period of time during the summer of 2010 because
one of his young patients from Staten Island overdosed on
Oxycodone.  According to CS-3, the family of this patient blamed
LANTING for the patient's condition and "took an axe" to
LANTING's front door, and did other assorted vandalism to the
SUBJECT PREMISES.

can have the prescription filled.  The "patient" then returns to the SUBJECT PREMISES after having the prescription filled and turns over the drugs to one of the bouncers.  In return for the Oxycodone pills, a bouncer then gives the patient either $500 or 50 Oxycodone pills – their choice.[5]

17.  On or about September 15, 2010, UC-1 and CS-1, each wearing audio and video recording devices, traveled to the SUBJECT PREMISES in order to meet with LANTING and purchase a prescription for Oxycodone.  On this particular day, there were two or three "bouncers" working at the SUBJECT PREMISES.  Prior to meeting with LANTING, a receptionist made appointments for both UC-1 and CS-1 to see LANTING again, on October 15, 2010. While UC-1 and CS-1 were meeting with LANTING, on September 15, 2010, one of the bouncers entered LANTING's office and showed LANTING an identification card for an unknown individual. LANTING proceeded to write a prescription and hand it to the bouncer, who asked LANTING how much he should charge the unknown

---

[5]     Based on information obtained during the course of this investigation, it is believed that the "bouncers" at LANTING's office are recruiting their own "patients" to see LANTING, paying for the patient's prescription from LANTING, and then giving the "patient" an additional $300 to fill the prescription and return the pills to the bouncers.  I am aware that the current "street value" of 180 tablets of Oxycodone is between $1,800 and $2,700. It is believed that the bouncers at LANTING's office are purchasing the prescriptions from LANTING using "patients" they recruit, and then selling the Oxycodone on the street for a significant profit.

-12-

individual.  LANTING then indicated that the bouncer should
charge $100 for the prescription.

18.  During the September 15, 2010 visit to the SUBJECT
PREMISES, UC-1 provided LANTING with a copy of a "MRI."  LANTING
reviewed the MRI and indicated to UC-1 that the report looked
normal and that nothing appeared to be wrong with UC-1.  LANTING
then went further and indicated that the name and information
depicted on the MRI did not match the name and information
provided by UC-1.  Nevertheless, LANTING provided UC-1 with a
prescription for 30 milligrams of Oxycodone consisting of 180
tablets, in exchange for $200 cash.[6]  CS-1 also purchased a
prescription from LANTING for 30 milligrams of Oxycodone
consisting of 180 tablets, for $200 cash.

19.  On or about October 15, 2010, UC-1, UC-2 and CS-1
traveled to the SUBJECT PREMISES in order to meet with LANTING
and purchase a prescription for Oxycodone.  UC-1, UC-2 and CS-1
were affixed with audio and video recording devices prior to
entering the SUBJECT PREMISES.  During this particular visit,
LANTING provided UC-1 with a prescription for 30 milligrams of
Oxycodone consisting of 180 tablets in exchange for $200 cash.
The only medical evaluation that was conducted of UC-1 on this
occasion consisted of LANTING placing a stethoscope on UC-1's

---

[6]     LANTING did listen to UC-1's chest with a stethoscope
during the visit, and also told UC-1 to bring the correct MRI
during his next visit.

chest. Neither CS-1 nor UC-2 were provided with a prescription by LANTING during this visit.[7]

20. On or about October 25, 2010, UC-1 and CS-1, while wearing audio and video recording devices, traveled to the SUBJECT PREMISES in order to meet with LANTING and purchase a prescription for Oxycodone. LANTING provided UC-1 with a prescription for 30 milligrams of Oxycodone consisting of 180 tablets, in exchange for $200 cash. LANTING did not perform a medical examination of UC-1, other than placing a stethoscope on UC-1's chest. Additionally, LANTING did not request any additional medical information from UC-1. With this October 25, 2010 visit, UC-1 was successful in obtaining two prescriptions from LANTING, totaling 360 tablets of Oxycodone, within a ten-day period.

21. On or about October 27, 2010, CS-1, while wearing an audio and video recording device, traveled to the SUBJECT PREMISES in order to meet with LANTING and purchase a prescription for Oxycodone. CS-1 was not able to meet with

---

[7] It should be noted that while UC-1, UC-2 and CS-1 were at the SUBJECT PREMISES on October 15, 2010, an unknown male entered the medical office, confronted LANTING, and accused him of providing "bogus" prescriptions to the unidentified male's nephew. After the unidentified individual departed the SUBJECT PREMISES, UC-1 observed LANTING retrieve a canvass bag from the upstairs residence of the SUBJECT PREMISES, and bring it into the downstairs medical office. Subsequent conversation between UC-1 and LANTING confirmed that a firearm was contained inside the canvass bag.

LANTING during this visit, however, as CS-1 was turned away by
Conspirator 3, and another individual.

### ITEMS LIKELY TO BE FOUND AT THE SUBJECT PREMISES

22.  Based on the foregoing, my involvement in this
investigation, and my training and experience, it is my belief
that there is probable cause that the SUBJECT PREMISES have been
and are continuing to be used to store instrumentalities,
evidence and fruits of violations of Title 21, United States
Code, Section 846, including, but not limited to, the following
items also listed in ATTACHMENT A:

a.   any and all documents evidencing agreements
with medical professional service providers, including other
medical physicians, pharmacies, drug companies, and insurance
companies;

b.   Calendars, appointment books, daily logs, co-
payment signature sheets, patient sign-in sheets, and telephone
logs, which might demonstrate when patients visited or contacted
the doctor for prescription medications;

c.   Explanations of Medical Benefit ("EOMB")
forms showing which patients' claims are being reimbursed;

d.   Any and all documents evidencing
correspondence or communications with insurance providers and
patients, including, but not limited to, provider applications,
refund requests, and documents evidencing billing practices;

-15-

e. Documents evidencing records of patient visits, dates of service, procedures performed, and billed amounts;

f. Insurance provider newsletters containing educational materials concerning proper billing practices and appropriate procedures for distributing controlled substances;

g. Any written billing instructions, including but not limited to, what CPT code to bill or what diagnosis to use;

h. Copies of any forms used to indicate what services should be billed for a patient's visit;

i. All employee contracts and contractor agreements, Employee Withholding Exemption Certificates (Form W-4) and Wage and Tax Statements (Forms W-2 and 1099) disclosing fees or commissions paid, and all applications for employment, personnel files, and professional licenses or certifications;

j. Items indicating where the proceeds of the scheme are held or how the proceeds have been used, including, but not limited to, bank account information, and financial records, whether maintained in hard copy or computerized, to include; general ledger, general journals, gross receipts and income records, cash receipts and disbursement records and/or journals, sales and purchase records, accounts receivables and payable ledgers, voucher register and all sales and expense

-16-

invoices including all invoices documenting expenses paid by cash, bank check, and retained copies of any bank checks;

k.   All financial statements, bookkeeper's and/or accountant's workpapers used in preparation of corporate records or tax returns. Retained copies of all federal and state income, payroll and excise tax returns, both personal and corporate;

l.   Prescriptions, patient drug profiles, prescription log books, records of prescription fills and refills, and Medicaid billing records;

m.   Telephones, pagers, cellular telephones, telephone answering machines, records and statements relating to those instruments, and the electronic communications stored thereon, identifying the ~~victims~~ and other participants of the scheme, and their respective locations;

n.   Address and/or telephone books, rolodex indices and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers of co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

o.   Any and all controlled substances including, but not limited to, diverted pharmaceuticals including Oxycodone, OxyContin, and traces thereof; equipment used to package controlled substances, as well as books, records, receipts,

-17-

notes, ledgers and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances;

p. United States or foreign currency, negotiable instruments, stocks, bonds, ~~jewelry~~, and precious metals and other valuables used to purchase controlled substances or equipment used to manufacture controlled substances, or which represent the proceeds of criminal activity;

q. Patient records and files, including but not limited to, the individuals identified by their initials in the chart below.[8] The chart consists of names retrieved from a Bureau of Narcotics report and reflects a subset of the defendant's patients who received Schedule II narcotics on a consistent basis since April 1, 2010. From my training and experience, the records and files of such patients would not and do not contain medical information commonly found in files of patients that were being dispensed Schedule II narcotics for a legitimate medical purpose.[9]

| FIRST INITIAL | LAST INITIAL |
|---|---|
| S | F |
| S | L |
| D | S |

---

[8]     I am aware of the full names of all the individuals identified by their initials in the chart below, and in the chart contained in ATTACHMENT A to this Affidavit.

[9]     To the extent that patients require medical records or files that are seized, the FBI will make copies of such records available upon request of the individual patient.

| | |
|---|---|
| R | M |
| K | M |
| C | I |
| O | M |
| A | P |
| T | G |
| P | M |
| R | D |
| Y | K |
| T | R |
| T | M |
| J | F |
| R | M |
| B | F |
| B | H |
| A | I |
| V | I |
| J | S |
| D | B |
| J | S |
| J | U |
| M | L |
| A | P |
| J | S |
| C | S |
| B | T |
| M | P |
| A | I |
| R | G |
| T | B |
| D | C |
| D | L |
| J | P |
| J | L |
| J | P |
| G | D |
| L | B |
| D | P |
| A | B |
| M | B |
| G | K |
| J | E |
| M | D |
| M | M |
| N | P |
| J | C |
| A | C |

| O | G |
|---|---|
| D | P |
| S | M |
| N | H |
| T | B |
| W | S |
| U | B |
| A | E |
| N | U |
| M | B |
| R | C |
| G | C |
| S | S |
| F | C |
| S | M |
| C | V |
| P | S |
| G | M |
| B | P |
| M | B |
| M | C |
| K | S |
| J | B |
| V | L |
| R | C |
| U | C |
| U | C |
| U | S |
| E | E |
| R | B |
| V | F |
| R | A |

        23.   Based on my training, experience, participation in
other investigations concerning narcotics trafficking, and
discussions with other law enforcement agents, I know that
individuals who illegally distribute and dispense narcotics
routinely secret and store items of the sort described in
ATTACHMENT A in secure locations like safety deposit boxes,
suitcases, safes, key-lock strong boxes, and other types of

locked or closed containers in an effort to prevent the discovery or theft of said items.  This warrant and this search procedure specifically include the search of any closed containers or cabinets, locked or unlocked, found within the SUBJECT PREMISES.

CONCLUSION

WHEREFORE, I respectfully request that: A) a search warrant be issued allowing agents to enter and search the SUBJECT PREMISES and to seize the items set forth in ATTACHMENT A to this Affidavit, all of which constitute evidence, fruits, and/or instrumentalities of violations of Title 21, United States Code, Section 846; and B) an arrest warrant be issued for defendant FELIX LANTING.  Due to the nature of this application, I further request that this application and its accompanying warrant be sealed.

WHEREFORE, your deponent respectfully requests that the search warrant and arrest warrant be issued as applied for herein.

MICHAEL S. TRIGLIA
Special Agent
Federal Bureau of Investigation

Sworn to before me this
15th day of November, 2010

E